IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CATRINA D. BLACKWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 13-00468-CV-W-GAF |
| | ) |
| ALLIANT TECHSYSTEMS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Presently before the Court is Plaintiff Catrina D. Blackwell's ("Plaintiff") Motion for Summary Judgment (Doc. # 66) and Defendants Alliant Techsystems Operations LLC ("ATK")[1], Ronald Baker[2], David Bales[3], and Tracy Bredehoeft's[4] (collectively "Defendants") Motion for Summary Judgment (Doc. # 67), both pursuant to Federal Rule of Civil Procedure 56. Plaintiff and Defendants each oppose the others' motion. (Docs. ## 74, 77, 78). For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

---

[1] Plaintiff was originally hired by Defendant Alliant Techsystems, Inc., but her employer during the relevant period was ATK, a subsidiary of ATK Inc. (*See* Doc. # 68, p. 2 n.2).

[2] Mr. Baker worked as a Manager of Human Resources for ATK from 2004 until his retirement in May of 2013. (Deposition of Ronald Earl Baker ("Baker Depo.") 9:17-19, 10:3-5). Mr. Baker is a sixty-seven year old white male. (*See id.* at 9:8-9; Deposition of Catrina Blackwell ("Blackwell Depo.") 49:17-18).

[3] Mr. Bales was the member of ATK's ethics committee who investigated Plaintiff's complaint. (Deposition of David O. Bales ("Bales Depo.") 9:5-22, 11:9-12).

[4] Mr. Bredehoeft, a fifty-five year old white male, was Plaintiff's supervisor. (Blackwell Depo. 52:4-7; Deposition of Tracy L. Bredehoeft ("Bredehoeft Depo.") 8:15-9:3; Declaration of Tracy Bredehoeft ¶ 2).

1

## DISCUSSION

**I.  FACTS**

ATK hired Plaintiff, an African-American female, on March 8, 2004.  (Blackwell Depo. 44:13-45:4, 49:19-21).  She worked in the loading wing of building two at the Lake City Army Ammunition Plant, a munitions facility for the United States Government that is operated by ATK under a federal contract.  (*Id.* at 46:18-47:7, 50:1-4).  Plaintiff worked as a powder pourer, which entailed making sure her co-workers on the assembly lines had enough bullets, cases, and powder.  (*Id.* at 74:16-23).  ATK terminated Plaintiff's employment on April 4, 2012.  (April 4, 2012 letter from Ron Baker to Catrina Blackwell).  Plaintiff then brought suit against Defendants, alleging race, gender, and age discrimination, retaliation, and defamation.  (*See generally* Second Amended Complaint).

**A.  The August 2011 Incident with Mr. Buie**

In August of 2011, Plaintiff was involved in a verbal altercation with Mr. Buie, a co-employee, which lead to Plaintiff and Mr. Buie being disciplined.  (*See* Blackwell Depo. 98:18-191:21, 103:15-104:4).  Mr. Buie is a forty year old African-American male.  (*See id.* at 82:16-83:2).  In 2011, Plaintiff was having a conversation with another co-worker, Martin King, while clocking out from work.  (*Id.* at 98:20-99:8).  After clocking out and walking to the parking lot, Mr. Buie approached Plaintiff and told her, "You don't need to whisper anything in that MF's ear, you don't need to talk to him."  (*Id.* at 99:13-16).

In response, Plaintiff told Mr. Buie, "You don't tell me who I can and cannot talk to.  I'm not talking to you."  (*Id.* at 99:17-19).  Mr. Buie started to yell and curse at Plaintiff and repeatedly called her a bitch.  (*Id.* at 99:20-100:3).  Plaintiff retaliated in turn and called Mr. Buie a bitch and ignorant.  (*Id.* at 100:4-9).  Mr. Baker, the human resources manager, interviewed

2

Plaintiff, Mr. Buie, and Mr. King to determine proper disciplinary action. (*Id.* at 106:1-6; Baker Depo. 101:16-25). Ultimately, Plaintiff received a Corrective Action Notice Form that read:

> [Plaintiff], this past week of August 1 2011, you became upset with another employee while standing in the line to clock out at the end of your shift. As a result of being upset with this employee you engage [sic] in a verbal altercation with the employee where both of you used profanity towards each other.
>
> [Plaintiff], conduct as described the [sic] above situation are in violation of General Plant Rule III-25 Causing discord and/or lack of harmony, which is disruptive to work efforts. Profanity directed at another in the work place is uncalled for and is disruptive and certainly disrespectful.
>
> [Plaintiff], your performance is unacceptable. As such you are being placed on WRITTEN WARNING. Failure to improve and sustain acceptable performance may result in further corrective action, up to and including discharge.

(Catrina D. Blackwell August 8, 2011 Corrective Action Notice Form). That same day, Mr. Buie received an identical Corrective Action Notice Form. (Michael D. Buie August 8, 2011 Corrective Action Notice Form).

**B.     The November 2011 Incident with Mr. Buie**

A second altercation between Plaintiff and Mr. Buie occurred later that same year on the evening of November 29, 2011. (Blackwell Depo. 123:24-124:3). That evening, Plaintiff went to Mr. Bredehoeft's office to complain about Mr. Buie using profanity, including the N-word, while at work. (*Id.* at 124:4-125:4).

Later that evening, Plaintiff and Mr. Buie met on opposite sides of double doors separating two wings of their workplace. (*Id.* at 129:8-16). At around that same time, Mr. King was also passing through this doorway with a buggy. (*Id.* at 131:5-23). According to Plaintiff, as she and Mr. Buie passed each other, she stepped to the side, but Mr. Buie took his right shoulder and rammed it into her right shoulder. (*Id.* at 129:17-19, 132:4-7). Plaintiff turned around and said, "You just going to bump into me and run into me and not say anything?" (*Id.* at

3

132:8-10). Plaintiff reports Mr. Buie started "whooping and hollering" and "cursing and screaming and yelling" at the top of his lungs in an incomprehensible manner. (*Id.* at 132:11-13, 19-20, 134:20-21). Plaintiff did not stop to engage in a confrontation but continued straight to Mr. Bredehoeft's office to tell him what had happened. (*Id.* at 132:14-17, 21-22).

Plaintiff says she told Mr. Bredehoeft about the incident and how Mr. Buie had run his shoulder into her shoulder. (*Id.* at 136:8-16). During the time while Plaintiff was reporting the incident to Mr. Bredehoeft, Mr. Buie burst into Mr. Bredehoeft's office. (*Id.* at 136:17-19). He claimed that he had not touched Plaintiff and the two started to argue. (*Id.* at 136:19-20).

Later that evening, Mr. Bredehoeft wrote an e-mail to Mr. Baker, in which he reported:

> At approx. 7:00, [Plaintiff] came to my Office complaining about [Mr. Buie] using profanity on the line and in the locker room a couple of weeks ago and at the time clock, She said that nobody what's [sic] to hear that stuff and she was tired of it. I called [Mr. Buie] to my Office shortly after that and asked him about it. [Mr. Buie] said that he does use some profanity like "shit" and "damn" but is not the only person on the line using it and feels he is getting singled out because of the tension between him and [Plaintiff] and along with Martin [King] who goes along with [Plaintiff]. I asked him that he needs to control what I call shop talk because you do have people that gets offended by hearing that type of language. Approx. 10 to 15 minutes later [Plaintiff] comes to my Office about [Mr. Buie]. She said that when they meet [sic] through the double doors inside the wing he acted like he was lowering his shoulder like to bump her. She said that if he touches, she may have to retaliate and be sorry about losing her job. I asked her if he had touched her and she said "No." By then [Mr. Buie] came to the Office and both were in my Office arguing, I asked them both to quit and asked [Mr. Buie] to step out of the Office.

(November 30, 2011 e-mail from Tracy Bredehoeft to Ron Baker).

Mr. Bredehoeft conducted an investigation into the incident that night by interviewing the employees working on the line. (November 30, 2011 e-mail from Tracy Bredehoeft to Ron Baker). He summarized their statements as follows:

> Darrell Zanders – There is already some tension between the two but [Mr. Buie] did not do anything was just trying to get through the door.

4

Charles Littlejohn – [Mr. Buie] was trying to go through the door barely brushed her if anything and she went off. [Plaintiff] initiated the confrontation. Tried to wave [Mr. Buie] back to line to not get into it.

Debbie Olmstead – [Mr. Buie] did not do anything. [Plaintiff] initiated the confrontation when she asked him "Try to bump me" [Mr. Buie] did not touch her.

Jason Hammond – Just rotated on line, didn't see anything, only saw them arguing. Nor sure who initiated it.

Patrick Oakes – Didn't see anything just heard the arguing.

Martin King – Getting ready to push buggy through the door as [Mr. Buie] was coming back into the back part of the wing, they passed each other and bumped into each other and [Mr. Buie] kept walking and [Plaintiff] turned and said, "Are you going to just bump into me" like wanting to get someone to say excuse me or pardon me.

(*Id.*).

Mr. Bredehoeft also summarized what he believed happened:

Here is what happen [sic], Martin [King] was pushing a buggy through the double doors in back of the Loading wing, [Mr. Buie] was trying to get back to work and the little room that there was he turned sideways to get through at the same time [Plaintiff] was heading the other way and that when she thought he was lowering his shoulder at her like to be bumping into her and then words were exchanged as everyone looked on from Line #5.

(*Id.*).

Mr. Baker was gone when the incident occurred, but investigated it upon returning. (Baker Depo. 102:13-14, 23-24). As a result of his investigation, he was unable to find anything to indicate that it was an aggravated situation or that Mr. Buie maliciously elbowed or ran his shoulder into Plaintiff. (*Id.* at 102:4-8, 10). Rather, he concluded that they had inadvertently touched while passing in a doorway. (*Id.* at 102:8-9). Neither Plaintiff nor Mr. Buie were disciplined as a result of this incident. (Blackwell Depo. 163:11-15; Bredehoeft Depo. 19:3-5).

C. The February 2012 Incident with Ms. Yardley

5

In February of 2012, Plaintiff was involved in an altercation with another of her co-employees, Ms. Yardley. (Blackwell Depo. 180:2-24). Prior to the date of the incident, Plaintiff and Ms. Yardley had spoken on only a couple of occasions. (*Id.* at 174:8). On one occasion, Plaintiff had tried to comfort Ms. Yardley when Ms. Yardley was crying because she was having trouble catching on to the work on the line. (*Id.* at 174:8-16). On three different occasions, Plaintiff remembered Ms. Yardley complimenting her and telling her she was pretty. (*Id.* at 175:8-9). Plaintiff also claims that Ms. Yardley would "constantly continuously stare" at Plaintiff during work and while they were getting dressed. (*Id.* at 178:9-15).

While walking from the parking lot to their work building on the date of the incident in February, Plaintiff told Mr. King about how Ms. Yardley would stare at her. (*Id.* at 177:24-178:2). That same day, while Plaintiff was getting ready, Ms. Yardley approached Plaintiff in the woman's locker room and told her that if she had something to say about her to say it to her. (*Id*. at 176:4-6). In response, Plaintiff told her "if she wanted to speak to [Plaintiff], then she could speak; if not, keep it moving." (*Id.* at 176:6-8). Plaintiff also remembers that she may have said, "Go on with that mess; go on with that foolishness." (*Id.* at 188:3-5). At that point, Plaintiff claims that Ms. Yardley started to point her finger in Plaintiff's face. (*Id.* at 176:8-10). Plaintiff claims she walked away and went to use the restroom and that Ms. Yardley was no longer in the locker room when she finished. (*Id.* at 186:13-20). After Plaintiff left the locker room she again crossed paths with Ms. Yardley, who told her, "You ain't shit to look at anyway." (*Id.* at 187:3).

On February 17, 2012, Ms. Yardley reported to ATK management that Plaintiff had elbowed her in the back just after the start of the shift. (*Id.* at 223:11-224:3). Jeff Peters, the supervisor of the Loading Department, told Ms. Yardley that without a witness there wasn't

anything he could do because it was a "he said/she said" situation. (Deposition of Leona Ramirez (formerly Yardley) 39:13-15). He then e-mailed Mr. Baker and Mr. Bredehoeft summarizing the situation:

> Just after the start of the shift, Leona Yardley came to me and stated that [Plaintiff] had elbowed her in the back. [Ms. Yardley] stated that she was at the case feeder on line 4 and [Plaintiff] did this as she walked by on the way out the door to go upstairs. [Ms. Yardley] stated that she did not think there were any witnesses as everyone was in the process of deciding how to man the lines. [Ms. Yardley] also stated that there has been friction coming from [Plaintiff] for a couple weeks such as some heated words and finger shaking in [Ms. Yardley's] face by [Plaintiff].

(February 18, 2012 e-mail from Jeff Peters to Ron Baker and Tracy Bredehoeft).

Mr. Baker investigated the incident when he returned to work the next week. (Baker Depo. 37:6-7; Catrina D. Blackwell Termination Request Form ("Termination Request Form"), 1). Mr. Baker first interviewed Ms. Yardley, who stated that a person had witnessed the incident but was afraid to come forward because he was a temporary employee. (Baker Depo. 37:7-14; Termination Request Form, 2). Mr. Bredehoeft subsequently e-mailed Mr. Baker and identified the alleged witness as Tyler Johnson. (Baker Depo. 43:5-8; Termination Request Form, 2).

Mr. Johnson orally corroborated Ms. Yardley's account of the situation and provided a written statement, which read:

> I Tyler Johnson saw [Plaintiff] elbow [Ms. Yardley] in the back on Friday Febuary [sic] 17, 2012. I was sitting on line 5 on the 1st Press and happen [sic] to see this incident. It was intentional from my prosective [sic]. She ([Plaintiff]) walked out the back exit door and what seemed to be at a steady pace. There was <u>NO</u> need for that.

(Termination Request Form, 2; February 17, 2012, Tyler Johnson Statement). A hand-drawn diagram is also included on the statement. (*See id.*).

That same day, Mr. Baker also interviewed Plaintiff, who denied having elbowed Ms. Yardley. (Blackwell Depo. 197:6-9; Baker Depo. 76:3; Termination Request Form, 2).

7

Thereafter, Mr. Baker suspended Plaintiff pending further investigation. (Blackwell Depo. 173:18-19, 197:1-3). Mr. Baker continued to interview the other employees working the night of the incident, but none reported seeing Plaintiff elbow Ms. Yardley. (*See* Baker Depo. 62:4-63:18; Termination Request Form, 2-3). Ultimately, Mr. Baker concluded that Plaintiff "had elbowed [Ms. Yardley] . . . and it was a deliberate act of violence. [Plaintiff's] behavior towards [Ms. Yardley] was intimidating and created discord and lack of harmony in the work environment." (Termination Request Form, 3). ATK terminated Plaintiff's employment for fighting or committing any act of violence, inciting a fight, threatening, intimidating or coercing fellow employees, and causing discord and lack of harmony, all in violation of Plant Rules. (April 4, 2012 letter from Ron Baker to Catrina Blackwell). Mr. Baker based his decision to terminate Plaintiff on his belief that Mr. Johnson's statement was accurate. (Baker Depo. 21:2-4, 54:9-19). He stated that having a statement corroborating Ms. Yardley's account "took it out of the realm of [Plaintiff's] word against [Ms. Yardley's] word." (*Id.* at 100:8-10).

Years later, in an Affidavit dated November 11, 2014, and again during his deposition on November 17, 2014, Mr. Johnson recanted his earlier statement and claimed that he didn't actually see the incident and only made the statement at the behest of Ms. Yardley. (Tyler Johnson Affidavit ("Johnson Aff."), 1-2; Deposition of Tyler Duane Johnson ("Johnson Depo") 17:1-15, 29:6-15, 32:14-33:7). Thereafter, when Defendants became aware that Mr. Johnson had recanted his earlier statement, they offered Plaintiff an "Unconditional Offer of Reinstatement." (November 26, 2014, Unconditional Offer of Reinstatement with ATK).

D.  **Plaintiff's Ethics Complaint**

ATK maintained an "Ethics Helpline," which employees could call to report any potential violations of ATK's code of conduct or any other employment issues. (Blackwell

8

Depo. 66:21-67:6). The day after Plaintiff's suspension but prior to her termination, Plaintiff called the Ethics Helpline and complained about her suspension, the incidences involving Mr. Buie and Ms. Yardley, and management's failure to respond to these incidences appropriately. (March 16, 2012 Ethics Helpline Report). David Bales, a member of the ethics committee, investigated Plaintiff's complaint. (Bales Depo. 9:5-22, 11:9-12). As part of his investigation, Mr. Bales interviewed Mr. Buie, Mr. King, Ms. Yardley, Mr. Bredehoeft, Mr. Baker, and others. (Investigation Report, 2-5). Although Plaintiff was initially wiling to be interviewed, she ultimately declined to do so without having counsel present. (Investigation Report, 1).

Mr. Bales concluded that there were no violations of the ATK Business Ethics Code of Conduct or other ATK policy or procedure committed by the individuals identified by Plaintiff. (Investigation Report, 7; May 8, 2012 e-mail from David Bales to Catrina Blackwell). However, Mr. Bales found that Plaintiff had violated at least three policies, including offensive work behavior/work place violence; fighting or committing any act of violence; and inciting a fight, threatening, intimidating or coercing fellow employees. (Investigation Report, 7; May 8, 2012 e-mail from David Bales to Catrina Blackwell). Mr. Bales stated that Mr. Johnson's statement was the deciding factor in his decision. (Bales Depo. 23:15-18).

## II.  LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir.

9

2011). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.  ANALYSIS

Plaintiff alleges that Defendants' actions violated her rights under Title VII of The Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. 623(a)(1), and the Missouri Human Rights Act (the "MHRA"), Mo. Rev. Stat. §§ 213.010 *et seq*. (Second Amended Complaint ¶¶ 7-8). In particular, Plaintiff alleges that Defendants' actions constitute race, gender, and age discrimination, retaliation, and defamation. (*See generally* Second Amended Complaint).

### A.  Race and Gender Discrimination Under Title VII and Section 1981

"A plaintiff may survive summary judgment either by direct evidence of discrimination, or by creating an inference of discrimination under the burden-shifting test in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)." *Wimbley v. Cashion*, 588 F.3d 959, 961 (8th Cir. 2009). Here, Plaintiff presented no direct evidence that her termination was motivated by discriminatory animus. (*See* Docs. ## 66, 77, 78, 82). Thus, both her Title VII and Section 1981 claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 n.2 (8th Cir. 2010). Under the *McDonnell Douglas* burden-shifting framework, "the plaintiff initially has the burden to establish a prima facie case

10

of discrimination." *Id.* at 873 (citing *McDonnell Douglas*, 411 U.S. at 802).

To establish a prima facie case of race discrimination, Plaintiff must show (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances gave rise to an inference of discrimination. *See id.* at 874. The fourth element is satisfied if similarly situated employees outside the protected class were treated differently than the plaintiff. *Id.*

If the plaintiff succeeds in establishing her prima facie case this creates a "rebuttable presumption of discrimination." *Id.* at 873. "The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "'If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext' for discrimination." *Id.* at 873-74 (quoting *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007)).

If the burden shifts back to the plaintiff to show that the proffered justification was pretextual, she may do so in two ways. *See Barnhardt v. Open Harvest Co-op.*, 742 F.3d 365, 371 (8th Cir. 2014). "First, the plaintiff may attack the factual basis underlying the proffered justification, thereby giving the jury a reasonable basis to doubt that the employer actually relied on that justification when it took its adverse employment action." *Id.* "Second, the plaintiff may show that it is more likely that an impermissible motive cause the employer's action than the permissible justification did." *Id.* Both approaches require the plaintiff "point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Id.* (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011)) (internal quotation marks omitted). This requires the plaintiff put forth "'more substantial evidence than it takes to make a prima facie case.'" *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)

11

(quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)) (alterations in original removed).  Specific to the summary judgment context, a "bare assertion and speculation as to [an employer's] motive does not create a genuine issue of material fact." *O'Brien v. Dep't of Agriculture*, 532 F.3d 805, 811 n.3 (8th Cir. 2008).

For the purposes of its Motion, Defendants appear to concede that Plaintiff was a member of a protected class, met her employer's legitimate expectations, and suffered an adverse employment action.  (*See* Doc. # 68, p. 19).  However, they argue that Plaintiff cannot establish a prima facie case because she is unable to demonstrate that she was terminated under circumstances permitting an inference of discrimination.  (*Id.*).  Further, Defendants argue that even if Plaintiff can establish a prima facie case, they are still entitled to summary judgment because "ATK's termination decision was for a legitimate, nondiscriminatory reason and [P]laintiff cannot show it is a pretext for unlawful discrimination."  (*Id.*).

### 1. *Circumstances Surrounding Plaintiff's Termination*

First, Plaintiff cannot establish a prima facie case of race or gender discrimination because the circumstances surrounding her termination do not give rise to an inference of discrimination.  As the United States Supreme Court held, "[t]he ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000).  Plaintiff argues that she satisfies this element because she was "similarly situated" to Ms. Yardley and Mr. Buie and received disparate treatment.  (Doc. # 66, p. 15).  This Circuit has developed two, inconsistent lines of cases on the standard to use when determining whether employees are similarly situated. *See Wimbley*, 588 F.3d at 962.  Under the first, more lenient test, the plaintiff is only required to show "that the employees are involved in or accused of the same or similar conduct and are

12

Case 4:13-cv-00468-GAF   Document 83   Filed 05/18/15   Page 12 of 19

disciplined in different ways." *Id.* (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005)) (internal quotation marks omitted). Under the second, more stringent test, the plaintiff is required to show "that the employees be similarly situated in all respects." *Id.* (quoting *Rodgers*, 417 F.3d at 851) (internal quotation marks omitted). Although the Eighth Circuit has recently applied the more stringent standard, *see Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 956 (8th Cir. 2012), it has noted in previous decisions "that the low-threshold standard more accurately reflects Supreme Court precedent." *Id.* (quoting *Rodgers*, 417 F.3d at 851) (internal quotation marks omitted). This Court does not believe that Plaintiff can demonstrate that she was similarly situated under either standard and thus it suffices to apply the more lenient test. Accordingly, this Court must determine whether Plaintiff and Ms. Yardley and Mr. Buie were involved in or accused of the same or similar conduct and disciplined in different ways.

In support of her race based discrimination claim, Plaintiff argues that Ms. Yardley, a white female, received more favorable treatment than Plaintiff under similar circumstances. In support of her gender based discrimination claim, Plaintiff argues that Mr. Buie, an African-American male, received more favorable treatment than Plaintiff under similar circumstances. The Court finds odd and slightly contradictory that Plaintiff argues on the one hand that a woman was treated more favorably than her in one situation (to support her race based discrimination claim) and that in another situation an African American was treated more favorably (to support her gender based discrimination claim). Notwithstanding this, the Court finds that the situations in question are not sufficiently similar as to support prima facie cases of discrimination.

Regarding the situation with Ms. Yardley, it is important to note that there are no allegations that Ms. Yardley physically interacted with Plaintiff. ATK terminated Plaintiff for

13

violating three ATK policies: (1) fighting or committing any act of violence, (2) inciting a fight, threatening, intimidating or coercing fellow employees, and (3) causing discord and lack of harmony. (April 4, 2012 letter from Ron Baker to Catrina Blackwell). All three of these alleged violations were premised on the fact that Mr. Baker determined that Plaintiff had physically touched Ms. Yardley. Ms. Yardley was only accused of being in a verbal dispute with Plaintiff. Thus, Plaintiff and Ms. Yardley were not involved in the same or similar conduct sufficient to support a finding that the two were similarly situated.

Mr. Buie was also not involved in a situation sufficiently analogous to the reason Plaintiff was discharged to support a prima facie case of gender based discrimination. Although Plaintiff alleges that Mr. Buie intentionally rammed his shoulder into hers (*see* Blackwell Depo. 136:8-16), Mr. Baker investigated the situation and determined that there was no evidence to support that Mr. Buie had maliciously touched Plaintiff. (*See* Baker Depo. 102:13-14, 23-24). At most, he concluded that Plaintiff and Mr. Buie had inadvertently touched while passing each other in a doorway. (*Id.* at 102:8-9). In contrast, Mr. Baker had evidence to support a finding that Plaintiff maliciously touched Ms. Yardley. Even though this evidence later proved to be false, at the time of Plaintiff's termination, Plaintiff and Mr. Buie were not similarly situated. Thus, Plaintiff and Mr. Buie were not involved in the same or similar conduct sufficient to support a finding that the two were similarly situated. Accordingly, Plaintiff fails to demonstrate a prima facie case of gender or race based discrimination.

### 2. *Defendants' Legitimate, Nondiscriminatory Reason for Plaintiff's Termination*

Moreover, even if Plaintiff were able to establish a prima facie case, her ultimate claim would still fail because ATK terminated Plaintiff for a legitimate, nondiscriminatory reason, namely, because Defendants honestly believed that Plaintiff had violently elbowed a co-worker

during work hours, in violation of ATK policies.  The Eighth Circuit has "consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006).

Plaintiff argues that termination was pretextual because she did not actually elbow Ms. Yardley, as evidenced by Mr. Johnson's recent recantation of his statement.  (*See* Doc. # 66, p. 19).  However, the truth of whether Plaintiff elbowed Ms. Yardley is immaterial to this lawsuit since "'[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  Rather, "[t]he critical inquiry in discrimination cases . . . is not whether the employee actually engaged in the conduct for which [she] was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 861-62 (8th Cir. 2009).  Accordingly, Mr. Johnson's recantation is insufficient to demonstrate pretext if Defendants believed his statement in good faith.

As this Court noted in its previous Order, Plaintiff has failed to present any evidence that Defendants knew Mr. Johnson's statement was untrue prior to his recantation in November of 2014.[5]  After Ms. Yardley reported that Plaintiff had elbowed her, Mr. Baker engaged in a

---

[5] Plaintiff argues that Defendants' "actions in connection with [Plaintiff's] termination reflected knowledge that Tyler Johnson's statement was false." (Doc. # 66, p. 19).  The main thrust of Plaintiff's argument is that Defendants actions are "inconsistent, inherently contradictory, contrived, and lacking credibility." (*Id.* at 20).  For example, Plaintiff claims that Defendants failed to produce Mr. Johnson's name during discovery (*see* Doc. # 66, pp. 19-20; Docs. ## 77, 78, pp. 20-21), that the signature on Mr. Johnson's statement is not Mr. Johnson's (*see* Doc. # 66, p. 20; Docs. ## 77, 78, pp. 14-17; Doc. # 82, p. 7) that Defendants intentionally provided an unreadably "defaced and obliterated" copy of Mr. Johnson's signature to the EEOC because the date on the statement was not the date the statement was taken (*see* Doc. # 66, p. 19; Docs. ## 77, 78, pp. 17-19; Doc. # 82, pp. 4-7), and that Plaintiff's counsel engaged in witness intimidation (*see* Doc. # 66, p. 21; Doc. # 82, pp. 2-4, 10-11).

15

thorough investigation. (*See* Baker Depo. 37:6-7; Catrina D. Blackwell Termination Request Form ("Termination Request Form"), 1). He interviewed Ms. Yardley, Plaintiff, Mr. Johnson, and the other employees at work that night. (Baker Depo. 37:7-14, 62:4-63:18 76:3; Termination Request Form, 2-3). The parties involved in the decision to terminate Plaintiff and deny her ethics complaint, namely Mr. Baker and Mr. Bales, both testified that their decision was based on a belief that Mr. Johnson's statement was accurate.[6] (Baker Depo. 21:2-4, 54:9-19; Bales Depo. 23:15-18). These actions indicate ATK took seriously Ms. Yardley's claims and engaged in a good faith investigation in an attempt to remove it from the realm of a "he said, she said" situation. Moreover, as soon as Defendants learned that Mr. Johnson's statement was untrue, they offered Plaintiff an "Unconditional Offer of Reinstatement." (November 26, 2014, Unconditional Offer of Reinstatement with ATK). The fact that Mr. Johnson lied to Defendants during their investigation is lamentable. However, as one district court has put it: "At most, [the employer's] decision was just plain wrong—which is unfortunate, but not actionable under Title

---

The Court finds Plaintiff's accusations are unpersuasive, not supported by the record, and immaterial. For example, Defendants explain that they did not include Mr. Johnson in their initial disclosures because they did not believe they would use him as a witness. (Doc. # 74, p. 31). Regarding the signature on Mr. Johnson's statement, Mr. Johnson's testimony is equivocal on whether the signature is his or not. (*See* Johnson Aff., 1; Johnson Depo. 45:8-14, 46:4-7, 66:15-22). Further, regarding the alleged inconsistency regarding the date on Mr. Johnson's statement, Mr. Baker recalls that Mr. Johnson put the date when he claimed the incident occurred, not the date he gave his handwritten statement. (*See* Baker Depo. 51:12-19). Moreover these issues are immaterial because Mr. Johnson admits that he wrote the statement and drew the diagram on it. (Johnson Depo. 18:4-25). As this Court previously held, "[t]he information contained within the statement, not whether the statement was signed or not, is what is relevant in the case before this Court." (Doc. # 64, p. 4). Lastly, although Mr. Johnson testified that Defendants' counsel asked him to stay away from Plaintiff's counsel, he later clarified that Defendants' counsel actually told him it was his choice whether or not he chose to speak with Plaintiff or her counsel. (Johnson Depo. 49:21-22, 93:9-13).

[6] Mr. Bredehoeft was not involved in the investigation of the incident between Plaintiff and Ms. Yardley or the decision to suspend or terminate Plaintiff. (Bredehoeft Depo. 23:12-13, 25:4-5, 27:8-15).

16

VII." *See Lee v. K Mart Corp.*, 836 F. Supp. 2d 841, 859 (D. Minn. 2011). Accordingly, Plaintiff's claims of race and gender discrimination fail as a matter of law.

**B.     Age Discrimination Under the ADEA**

To establish a prima facie case of age discrimination, Plaintiff must show (1) that she was at least forty years old, (2) suffered an adverse employment action, (3) was meeting her employer's reasonable expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger. *See Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1136 (8th Cir. 2006). Defendants concede that Plaintiff satisfies the first three elements. (*See* Doc. # 68, p. 19). Plaintiff argues that "ATK employed a decidedly young workforce" and allowed these younger employees "to behave in a rowdy manner, cursing, being loud and profane and otherwise acting up." (Doc. # 77, p. 29). She further argues that ATK favored its younger employees, and specifically, that Defendants favored Mr. Buie and Ms. Yardley (both of whom are younger than forty) in their disputes with Plaintiff. (*Id.* at 29-30). As discussed above, each of these incidences were thoroughly investigated to determine who was at fault. Moreover, the Court need not decide whether Plaintiff satisfies the fourth element because, as also discussed above, even if Plaintiff demonstrates a prima facie case of age discrimination, Defendants have established that they terminated Plaintiff for a legitimate, nondiscriminatory reason. Accordingly, Plaintiff's claim of age discrimination also fails as a matter of law.

**C.     Retaliation**

To establish a prima facie case of retaliation, the plaintiff must show "'(1) that he or she engaged in a statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events.'" *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006) (quoting *Gilooly v. Mo. Dep't of Health*

17

*& Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005)). "[R]etaliation claims brought under Title VII must be proved according to traditional principles of but-for causation." *Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 919 (8th Cir. 2014) (citing *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S. Ct. 2517, 2534 (2013)). Moreover, just as with a discrimination claim the defense may "rebut the plaintiff's case by advancing a legitimate, nonretaliatory reason for the adverse employment action." *Rheineck v. Hutchingson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir. 2001)).

Plaintiff filed her complaint with the Ethics Helpline the day after she was suspended due to her altercation with Ms. Yardley. (March 16, 2012 Ethics Helpline Report). The result of the ethics investigation corroborated Defendants' rationale for terminating Plaintiff's employment. Specifically, the investigation found that Plaintiff had violated at least three ATK policies. (Investigation Report, 7; May 8, 2012 e-mail from David Bales to Catrina Blackwell). Thus, there is no evidence that Plaintiff's employment was terminated because of her filing an ethics complaint. Rather, the facts support that Plaintiff was discharged because of Defendant's good faith belief that Plaintiff had engaged in work place violence in violation of ATK policy. Accordingly, Plaintiff's claim of retaliation fails as a matter of law.

D.     **Defamation and Claims Arising Under the MHRA**

Defendants moved for Summary Judgment on Plaintiff's defamation claims and her claims under the MHRA. (Doc. # 68, pp. 28-31). In her Suggestions in Opposition and Amended Suggestions in Opposition, Plaintiff fails to address the issues raised by Defendants or any of Defendants' arguments regarding these claims. (*See* Docs. ## 77, 78). Accordingly, the Court assumes that Plaintiff is abandoning this claim and that Defendants are therefore entitled to summary judgment on these issues. *See United States v. NHC Health Care Corp.*, 163 F. Supp.

2d 1051, 1058-59 (W.D. Mo. 2001) (finding that the plaintiff abandoned claims it failed to address in its opposition to the defendants' motion for summary judgment).

## CONCLUSION

Plaintiff claims that her termination from ATK constituted race, gender, and age based discrimination. However, Plaintiff fails to demonstrate that she was treated differently than similarly situated individuals. Moreover, Defendants have presented evidence that they terminated Plaintiff for a legitimate, nondiscriminatory reason. Further, Defendants' legitimate, nondiscriminatory reason for terminating Plaintiff's employment also defeats Plaintiff's age discrimination and retaliation claim. Lastly, the Court finds that Plaintiff has abandoned her claims of defamation and her claims arising under the MHRA. Accordingly, for these reasons and the reasons set forth above Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner<br>
Gary A. Fenner, Judge<br>
United States District Court

DATED: May 18, 2015